## Richmond

### Henry E. Howell, Jr. v. Chesapeake and Potomac Telephone Company of Virginia, Et Al.

January 20, 1975.

Record No. 740406.

Present, I'Anson, C.J., Carrico, Harrison, Harman and Compton, JJ.

*Henry E. Howell, Jr., pro se.*

*Joseph E. Blackburn (Warner F. Brundage, Jr.; Howard C. Anderson; Frank M. Steadman, Jr.; Richard D. Rogers, Jr.,* on briefs), for appellees.

Compton, J., delivered the opinion of the court.

This is an appeal of right [1] by an individual intervenor from an order of the State Corporation Commission which authorized the Chesapeake and Potomac Telephone Company of Virginia to

---

[1] Va. Const. art. IX, § 4; Code § 12.1-39.

increase its rates for service rendered to Virginia telephone subscribers on and after January 22, 1974.

On June 15, 1972, C & P filed its application with the Commission for an increase in rates charged for its intrastate Virginia service. Prior to the present request, C & P had last obtained rate relief effective December 1, 1971. In the previous hearing, the Commission used a 1970 test period and prescribed rates designed to enable C & P to earn 8.5% on its intrastate investment. In the present case, C & P asserted that its capital requirements had continued to increase since 1971 and that because the overall cost of capital to it at the time of the instant application was at least 9.4%, it was necessary for it to achieve that return to attract the capital needed to provide adequate service to its Virginia customers. C & P's proposed rates and charges were designed to produce additional gross revenues of $36,048,000 and were set forth in an exhibit attached to the application.[2]

The case matured and hearings commenced in September, 1972. After eight days of proceedings, the Commission granted a motion of its counsel to recess the case in order to give C & P an opportunity to gain a full year's experience under the increased rates authorized in the prior case. Hearings resumed in May, 1973, and concluded in the following month. The transcript of the eighteen days of hearings contains approximately 5,000 pages. More than 200 exhibits were introduced. During the proceedings, appearances were entered for seventeen parties including the Attorney General of Virginia,[3] the United States Department of Defense, and the appellant Henry E. Howell, Jr. (Intervenor), then Lieutenant Governor of Virginia, appearing *pro se.*

In the order appealed from entered on January 9, 1974, the Commission granted C & P a portion of the relief sought. Filed with the order was the majority opinion of Commissioner Shannon with Commissioner Harwood concurring. Commissioner Bradshaw concurred with the majority except in those

---

[2] As the result of rulings made early in the hearings, C & P filed amended rate schedules and ultimately sought authority to publish revised tariffs which would produce $32,711,000 of additional gross revenues.

[3] Code § 2.1-133.1 provides for the appearance of the Attorney General of Virginia before the Commission in hearings of this type to "represent the interests of the people as consumers."

instances wherein the rate base determination conflicted with his views on the subject stated in a prior case.

The Commission, using 1972 as the test year, found that C & P's level of earnings for that year was at the rate of 7.64% on a rate base of $808,477,597 as of December 31, 1972, and concluded that C & P was entitled to revenue relief. It found that C & P should be authorized to increase its schedules of rates and charges to enable it to earn an 8.65% rate of return upon the intrastate rate base. It further concluded that such rate of return upon the rate base would give C & P an opportunity to earn an 11% return upon its equity capital. The Commission also determined that schedules of rates and charges designed to produce $12,636,371 in additional gross revenues would give C & P an opportunity to earn the 8.65% rate of return upon the rate base and accordingly denied C & P's proposal based on schedules of rates and charges intended to generate $32,711,000, note 2, *supra*, in additional gross revenues. The order also provided for distribution of the amount of the increase among various classes of customers.

We affirm the order of the Commission.

The Intervenor, who did not present the testimony of any witnesses, but otherwise participated fully in the hearings, assigned sixteen errors. The basic issue is whether the Commission has acted within the scope of its legislative discretion. Specifically, the questions to be decided are whether the Commission erred in finding that a fair rate of return for C & P on its intrastate rate base was 8.65%; whether the Commission's method of determining intrastate rate base was proper; and whether the Commission erred in allowing certain charitable contributions to be deducted as expenses when determining net income.[4]

C & P, a Virginia corporation and a wholly-owned subsidiary of American Telephone and Telegraph, furnishes telephone

---

[4] The Commission, an appellee, through its counsel filed a separate brief stating that it is "in the nature of an offering of an *amicus curiae*. The primary argument has been left to the Company which received the benefit of the rate increase approved by the Commission's order. The Commission's response to Howell's brief is offered to demonstrate to this Court that its order, on appeal in this proceeding, fully conforms with the prior decisions of this Court, complies with sound principles of utility regulation, and reasonably lies within the bounds of legislative discretion conferred by the Constitution of Virginia and the General Assembly of Virginia."

communication service within the State of Virginia. The Commission's majority opinion notes that "AT&T also owns all, or part, of the capital stock of various other telephone companies operating throughout the United States and Canada. All of these companies together are known as the Bell System, which also includes Western Electric Company and Bell Telephone Laboratories, Inc. Each operating company, including C&P of Virginia, manages and conducts its internal affairs to the extent that the parent, AT&T, and the local company deem it economically and practically expedient to do so." C & P's Virginia rates, charges, services and facilities are subject to the regulatory power of the State Corporation Commission.[5]

C & P's evidence showed that following the 1971 rate increase, it earned the then authorized return of 8.5% on its average rate base for approximately one year, and that during the latter part of 1972, its earnings began to fall to a point where the adjusted earnings for 1972 were only 7.29%. Citing the growth in its construction program from 1971 to 1973, C & P's evidence also showed the necessity of earning 9.33% on its Virginia jurisdictional properties which would afford the opportunity for a return of 12.5% on its common equity. C & P contended, as stated, that $32,711,000 of additional gross revenue was required to attain the foregoing level of earnings.

Before the Commission, opposition to the proposed increase came from both residential and business customers of C & P. The contentions of the opponents were many and varied. For example, the Department of Defense contended that no rate increase was necessary because no justification had been shown for a rate of return higher than 8.5%, which, it asserted, C & P was then earning. Arlington County contended that C & P was entitled to a 10.75% return on common equity using a 50% debt equity ratio. It urged that additional gross revenues be limited to $4,682,000. The Attorney General of Virginia took the position that the 8.5% rate of return was sufficient and, when applied to a 1972 rate base of approximately $752,000,000 (as computed by another intervenor), would justify an increase of C & P's gross revenues of not more than $10,000,000.

The Commission's staff made a thorough examination and study of C & P's books and records. It analyzed C & P's proposed

---

[5] Va. Const. art. IX, §2; Code § 12.1-12.

rate structure, rules and regulations. It employed an economist who testified concerning rate of return and cost of capital. The staff recommended an overall rate of return ranging from 8.29% to 8.68% which would produce a return on equity of 10.2% to 10.7%. This was based on a capital structure consisting of 50% to 55% debt, with the balance in equity and deferred taxes.

The Commission's majority opinion carefully examined the evidence and discussed in detail the test period, the rate base, the rate of return, and the rate design. It pointed out that the 1972 calendar year *test period* was reasonable because when hearings on the application commenced in September, 1972, C & P did not have a complete year's earning experience under the increase granted in the 1971 rate case, and to proceed at that time with the hearings would have required the use of projections to arrive at a full twelve month test period. Consequently, the case was recessed and C & P's actual 1972 experience was available as evidence when the hearings resumed.

The Commission defined C & P's *rate base* as including ". . . the total investment in its plant and equipment used and useful in intrastate public service plus an allowance for working capital, which is the investment in cash, materials, supplies, etc., necessary for the efficient and economical day-to-day operations of the Company." It found that as of December 31, 1972, ". . . the original cost of utility plant used and useful both in interstate and intrastate commerce plus allowances less reserves was $1,046,675,939." It used "separation procedures" established in a Separations Manual, as amended, used by the National Association of Regulatory Utility Commissioners — Federal Communications Commission Committee on Communications and adopted for use by the FCC, to allocate and separate C & P's plant and expenses into intrastate and interstate components.[6] C & P made the actual separations study, and it was verified by the Commission's staff, which found the December 31, 1972, intrastate rate base to be $805,860,133. The Commission adopted that finding but adjusted it because, subsequent to the conclusion of the hearings, new depreciation rates prescribed by

---

[6] These items must be divided between interstate and intrastate uses for rate making purposes because C & P's interstate and Virginia intrastate operations are regulated by the Federal Communications Commission and the State Corporation Commission respectively.

the FCC were published, thereby causing a reduction in C & P's Virginia depreciation expense by \$2,617,464 in 1972, and thereby increasing the intrastate rate base to \$808,477,597. This determination was reflected in the following table in the majority opinion:

"Virginia Intrastate Rate Base
as of December 31, 1972

| | |
|---|---:|
| Telephone Plant at December 31, 1972 | |
|     Telephone Plant in Service | \$ 963,773,952 |
|     Telephone Plant under Construction | 37,792,000 |
|     Property Held for Future Telephone Use | 690,933 |
|     Total Telephone Plant | \$1,002,256,885 |
| Less: Depreciation Reserve | \$ 206,029,063 |
| Net Telephone Plant | \$ 796,227,822 |
| Allowance for Working Capital | |
|     Materials and Supplies | \$ 4,418,387 |
|     Cash (Approximately 20 Days of Operating Expenses, Exclusive of Depreciation and Amortization) | 7,831,388 |
|     Total Allowance for Working Capital | \$ 12,249,775 |
| Net Utility Plant and Allowances | \$ 808,477,597 " |

Using the Separations Manual, the Commission found that of the total operating revenues of \$412,463,747, C & P's Virginia intrastate revenues were \$309,358,630, after certain adjustments were made. It further found that of the total operating revenue deductions of \$334,685,381, C & P's Virginia adjusted intrastate operating revenue deductions were \$250,507,906. Intrastate net income was reduced to reflect net charitable contributions of \$101,409.

The below table from the Commission's opinion shows the test period level of earnings.

"Level of Earnings Under Existing Rates — 1972

| | | |
|---|---|---|
| Total Operating Revenues | | $309,358,630 |
| Total Operating Revenue Deductions | $251,570,835 | |
| Plus: Cost of Living-Wage Adjustment Net | 298,152 | |
| Less: Net Depreciation Revision | 1,361,081 | 250,507,906 |
| Net Operating Income | | $ 58,850,724 |
| Plus: Interest During Construction | | 3,045,347 |
| Less: Charitable Contributions (Net) | | 101,409 |
| Net Operating Income Adjusted (Current Level of Earnings) | | $ 61,794,662 " |

This demonstrated that on the rate base of $808,477,597, the level of earnings was at a rate of 7.64%.

The *rate of return* issue generated considerable disagreement among the parties. The "cost-of-money" expert witnesses urged overall rates of return from 7.9% (Department of Defense) to 9.33% (C & P) and return on equity from 9.3% (Department of Defense) to 12.5% (C & P). The capital structure to be used in determining a fair return for C & P was also a controversial subject. The Commission concluded that it was proper to use the debt ratio of the Bell System, of which C & P is a part, in computing C & P's cost of capital. *City of Lynchburg* v. *Telephone Company*, 200 Va. 706, 107 S.E.2d 462 (1959).[7] The Commission stated that ". . . the evidence in this case does not justify departure from use of the Bell System's capital ratio and we will, therefore, use AT&T's consolidated objective capital structure of 45 percent debt, 4 percent preferred and 51 percent equity, which capital structure insofar as C & P is concerned is hypothetical. We feel that use of AT&T's consolidated objective capital structure for rate-making purposes is fair to both the subscribers and the Company." Using the foregoing hypothetical capital structure, the Commission concluded that 8.65% was a just and reasonable overall rate of return and that this would

---

[7] For an explanation of the importance of the debt and equity ratios in fixing the rate of return, *see* 200 Va. at 718-19, 107 S.E.2d at 470-72.

afford C & P an opportunity to earn a return on equity of approximately 11%. The Commission determined that a 45% debt ratio would increase interest expense, thereby resulting in a reduction of $1,862,215 in C & P's Federal income tax. Net operating income would increase in the same amount. Accordingly, the foregoing net operating income for 1972 of $61,794,662, adjusted for the effect of the assumed capital structure, would increase to $63,656,877. This was illustrated in the Commission's opinion as follows:

"Level of Earnings Under Existing Rates — 1972

| | | |
|---|---|---|
| Total Operating Revenues | | $309,358,630 |
| Total Operating Revenue Deductions | $251,570,835 | |
| Plus: Cost of Living Wage Adjustment | 298,152 | |
| Less: Net Depreciation Revision | 1,361,081 | |
| Less: Reduction in Federal Income Tax as result of Hypothetical Debt Ratio | 1,862,215 | 248,645,691 |
| Net Operating Income | | $ 60,712,939 |
| Plus: Interest During Construction | | 3,045,347 |
| Less: Charitable Contributions (Net) | | 101,409 |
| Net Operating Income Adjusted | | $ 63,656,877 " |

The Commission then concluded that C & P required $12,636,371 in additional gross revenues. As demonstrated by its table below, it applied the allowed rate of return to the adjusted rate base and determined C & P's earnings requirements. Then, by deducting adjusted net operating income as set forth in the above table, the additional earnings required were computed as follows:

"December 31, 1972 Rate Base                    $808,477,597
  Percentage Rate of Return                              8.65

Total Net Earnings Needed                      $ 69,933,312
Net Earnings — Test Period
  (After Adjustments)                            63,656,877

Additional Net Earnings Needed                   6,276,435
Additional Gross Earnings Needed               $ 12,636,371 "

Finally, in its opinion, as stated, the Commission discussed the *rate design*, that is, the manner of distribution of the authorized increase among C & P's classes of customers.

■ There are fundamental and established criteria for judicial review of an order of the Commission fixing rates and charges for a public utility. In the discharge of its constitutional mandate, the Commission is empowered to fix rates which "shall be just and reasonable." Code § 56-235. This is a purely legislative function and, in such matters, the Commission is the legislative branch of the government. *Norfolk* v. *Chesapeake, etc., Tel. Co.*, 192 Va. 292, 300, 64 S.E.2d 772, 776 (1951). "In fixing rates within the limits of what is confiscatory to the utility on the one side, and exorbitant as against the public on the other side, and thus definitely unfair and unjust to the telephone users, there is a reasonably wide area within which the Commission is empowered to exercise its legislative discretion. As it enjoys the full legislative power of the State within these bounds, the rate of return that it allows may not be changed or set aside as confiscatory or unreasonable and unjust unless it clearly evinces an abuse of legislative discretion." *Id.* In fixing rate of return, the Commission functions as an expert tribunal and its order, upon review, is presumed to be just, reasonable and correct. *Commonwealth* v. *Portsmouth Gas Co.*, 213 Va. 239, 241, 191 S.E.2d 220, 222 (1972). " 'We do not sit as a board of revision to substitute our judgment for that of the legislature, or of the Commission lawfully constituted by it, as to matters within the province of either.' " *Chesapeake, etc., Tel. Co.,* v. *Commonwealth*, 147 Va. 43, 57, 136 S.E. 575, 578 (1927) *quoting from* the *Minnesota Rate Cases*, 230 U.S. 352, 433 (1912).

Controlled by the foregoing settled principles, we examine the contentions of the Intervenor. Initially, in order to evaluate properly the issues raised in this case, the basic elements of rate

making should be reviewed. In a rate case, the Commission must first ascertain the value of the applicant's property used and useful in the rendition of its *intrastate* service (rate base), its annual gross revenues, and its annual operating expenses. *Norfolk* v. *Chesapeake, etc., Tel. Co., supra,* 192 Va. at 301, 64 S.E.2d at 777. When these matters have been determined, the Commission must set the "percentage rate of return at such a figure as will afford the utility reasonable opportunity to earn a fair and just return on its investment." 192 Va. at 301-02, 64 S.E.2d at 777-78. *See* 1 A.J.G. Priest, Principles of Public Utility Regulation 45 (1969).

First, the Intervenor contends that improper rate of return evidence was used as the basis for finding the 8.65% rate. He argues that the settled law "[p]recluded the Commission from finding a fair return for the Virginia intrastate jurisdiction based upon financial data and rate of return testimony which did not solely relate to the Applicant's cost of serving the Virginia intrastate jurisdiction." The Intervenor apparently takes the position that in determining rate of return, the Commission is restricted to economic factors existing wholly within the State of Virginia when considering cost of money. We reject this contention. Following established rate making procedures, the Commission examined *intrastate* rate base, *intrastate* revenues and *intrastate* expenses. Then it determined a fair rate of return for C & P's *intrastate* business, by considering evidence showing the Bell System's nationwide experience. C & P was properly treated as a "miniature Bell System." *City of Lynchburg* v. *Telephone Company, supra,* 200 Va. at 718, 107 S.E.2d at 471.

The Commission's approach follows the principle that the return to the equity owner should correspond with returns on investments in other businesses having corresponding risks, and the return "should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." *Federal Power Commission* v. *Hope Natural Gas,* 320 U.S. 591, 603 (1944). Accordingly, in this case consideration of merely local, and even regional, rate of return evidence would have been inappropriate. When establishing a figure which "will afford the utility reasonable opportunity to earn a fair and just return on its investment," a nationwide perspective is necessary and was appropriate in this case.

■ The Intervenor next contends that customer deposits, unamortized investment tax credit reserves, the reserve for deferred taxes, and unmatured interest were improperly included by the Commission in the rate base.[8] He relies upon *Princess Anne Utilities Corporation* v. *Commonwealth*, 211 Va. 620, 179 S.E.2d 714 (1971) and contends that the inclusion of the foregoing accounting items in rate base requires "customers to pay a rate of return on property which has been purchased with their own funds." We disagree. In *Princess Anne*, we decided that the Commission properly excluded contributions in aid of utility construction in determining the utility's rate base. 211 Va. at 623, 179 S.E.2d at 716. None of the foregoing accounting items are "contributions in aid of construction" nor may a proper analogy be drawn in this case between the contested items and the item considered in *Princess Anne*. The Commission established an end-of-period net original cost investment rate base in this case and the inclusion therein of the foregoing entries properly falls within the range of its legislative discretion.

■ Finally, the Intervenor argues that the Commission erred in allowing deduction of net charitable contributions of $101,409 when net income was determined. This contention is without merit. The allowance of this item has been previously approved by us and we adhere to that view in this case. *Board of Supervisors* v. *VEPCO*, 196 Va. 1102, 1118, 87 S.E.2d 139, 149 (1955).

From a review of this entire record, we hold that the Intervenor has failed to show an abuse of legislative discretion and the order of the Commission will, therefore, be affirmed.

Upon motion of the appellee, the cost of producing the appendix, including the costs advanced by the appellee as required by Rule 5:36(b), shall be taxed to the appellant. Code §§ 14.1-181 and 14.1-182.

*Affirmed.*

---

[8] Commissioner Bradshaw excepted to the inclusion of customer deposits in rate base.