## Richmond

APPALACHIAN POWER COMPANY V. COMMONWEALTH OF VIRGINIA.

January 16, 1976.

Record No. 750603.

Present, I'Anson, C.J., Carrico, Harrison, Cochran, Poff and Compton, JJ.

*Carl D. Hobelman* [N.Y.] (*John L. Walker, Jr.; Samuel M. Sugden* [N.Y.]; *Woods, Rogers, Muse, Walker & Thornton; LeBoeuf, Lamb, Leiby & MacRae* [N.Y.], on briefs), for appellant.

*Edward L. Flippen* (*Richard D. Rogers, Jr.,* on brief), for State Corporation Commission.

COMPTON, J., delivered the opinion of the court.

In this rate case, Appalachian Power Company claims that the rate relief granted by the State Corporation Commission was inadequate.

The Company prosecutes this appeal of right from a May 1, 1975, order of the Commission which, *inter alia*, found that a just and reasonable overall rate of return on Appalachian's Virginia jurisdictional rate base for the twelve months test period ending December 31, 1974, was 8.40 per cent. The order permitted the Company to file schedules of rates and charges to produce additional annual gross revenues of $19,046,756.

In the application for a rate increase, filed with the Commission on December 2, 1974, pursuant to Code §§ 56-237 and 56-240, the Company sought an annual increase in its Virginia jurisdictional rates of $36,196,600 to become effective no later than March 31, 1975, contending that sum would amount to an overall rate of return of 9.65 per cent on its Virginia jurisdictional business based on an adjusted 1974 test year. It asserted that the foregoing overall rate of return "equates to" a rate of return on common equity of 15.50 per cent. The Company also requested an interim rate increase of $25,012,000, pursuant to Code § 56-240, to become effective no later than January 1, 1975, pending the Commission's determination of the request for a permanent rate increase.

The Company alleged that its application was based on its inability to finance new construction necessary to serve its existing or prospective commercial and industrial customers. This inability was caused, it stated, by the "critical level" of its short-term debt which it was unable to refinance on a permanent basis. It also contended that because of its precarious financial situation, certain construction in progress was to be suspended on December 31, 1974, to be reactivated in March 1975 only if permitted by the Company's financial condition, particularly its interest coverage.[1] It further contended that substantial rate relief was necessary by January 1, 1975, to "avoid

---

[1] One of the Company's expert witnesses testified that: "Coverage with respect to utility long-term debt is usually defined as the number of times annual interest on such debt has been earned, that is,—how many times as large as the interest charges is the income available to pay such interest charges. Traditionally, investors have used coverage as a measure of the relative safety of their investment and coverage can be employed to gain an insight into the relative level of profitability."

initiating a program leading to a substantial reduction in Company work force."

The Company also alleged that it had made certain non-recurring accounting changes during 1974, which had the effect of more closely "matching" revenues and expenses, and which had been instrumental in permitting the Company to carry on its activities throughout most of 1974. It contended that its interest coverage had reached the level where the Company would be unable to issue any additional long-term debt, even if a planned sale of about $40 million of revenue bonds to finance pollution control was successful.

Stating that short-term debt is only a source of interim financing, the Company asserted that without immediate and substantial rate relief, its operations would be drastically curtailed in order that its financial requirements be kept within the maximum short-term debt capability. It maintained that it could not allow its short-term debt to reach $150 million without assurance of the means to refinance and repay it by the use of long-term capital. It alleged that without a rate increase, its short-term debt requirement of approximately $170 million by June 30, 1975, and over $300 million by the end of 1975, could not be met.

The Company contended that denial of a substantial rate increase would compel it to develop and implement "a cost reduction program of last resort"; that "construction costs, including costs of environmental backfit on existing units have placed a tremendous strain on the Company's cash flow and financing capabilities"; that since the Commission's denial of its application for emergency rate relief,[2] its construction budget for 1975 had been "slashed"; and that the only remaining available area of cost reduction was operating and maintenance expense, which included employee reductions.

The Company concluded its application by stating that in limiting the amount sought to $36,196,600, it was requesting the minimum increase necessary to allow it to render adequate service and that, even with the full increase, coverage of interest expense would remain "a serious problem."

The Company's residential customers presented the main opposition to the application, although some industrial users, and others, also opposed it. The Attorney General of Virginia appeared, as provided by Code § 2.1-133.1, to "represent the interests of the people as

---

[2] The Company's application for emergency rate relief, see Code § 56-245, amounting to $35.7 million was filed in August 1974 and was denied by the Commission in November 1974.

consumers." He concluded that the rate request should be reduced to $20.7 million.

After hearings were held in Richmond, Abingdon and Roanoke during January and February 1975, the application for an interim rate increase, which had previously been suspended, was denied by order of February 28, 1975, one Commissioner dissenting. On May 1, 1975, the order appealed from was entered, which incorporated an opinion written by one Commissioner and concurred in by another. The third Commissioner, who had previously disagreed with denial of the interim increase, dissented in part.

The record establishes that Appalachian Power Company, employing about four thousand persons, is a subsidiary of the American Electric Power Company, Inc. (AEP) and serves 635,000 customers in Virginia and West Virginia, of which about 310,000 reside in 31 counties located in the western part of the Commonwealth. The Company owns and operates all or part of six coal-burning steam electric generating plants, two being located in Virginia.

AEP is a public utility holding company which owns several electric utility operating companies. All of the revenues of AEP are derived from common stock dividends of the subsidiary companies and it owns, directly or indirectly, all of the common equity of the operating subsidiaries. The subsidiaries market their preferred stock and long-term debt directly.

In addition to Virginia and West Virginia, the operating properties of the AEP subsidiaries are located in Indiana, Ohio, Kentucky, Michigan and Tennessee. The subsidiaries are physically interconnected and their operations are coordinated as a single integrated electric utility system. AEP also has several other subsidiaries, including several coal mining companies, a small railroad, and a service corporation. On a combined basis, Appalachian (25.8%), Indiana and Michigan Electric Company (26.4%), and Ohio Power Company (40.2%) utilize over 90 per cent of the combined system's utility plant.

The evidence showed that a knowledge of the AEP System is important because: (1) an understanding of the system's operating and funding procedures is an aid in determining the appropriate capital structure for rate making purposes; (2) the same factors are useful in establishing the cost of the subsidiaries' debt and equity capital; (3) the relative earnings levels of the several subsidiaries provide an indication as to the strength of the various links in the system; and (4) from the foregoing information, the overall system

earnings requirements and, in addition, the financial needs of the several subsidiaries, can be discerned.

On appeal, there is no disagreement among the parties[3] concerning jurisdictional separations; the Company's Virginia jurisdictional rate base, which the Commission established to be $544,825,672; and Virginia operating revenue and expenses for the test year. The Commission determined the Company's actual jurisdictional net operating income, adjusted, for the test year to be $36,240,378. Moreover, the Company does not dispute the Commission's determination of the relative proportions of debt, preferred stock and common equity in the capital structure of the Company or its conclusions as to the costs of short-term debt, long-term debt and preferred stock. The majority opinion stated the Company's cost of capital to be as follows:

| | Percent of Capitalization | Embedded Cost | Cost Factor |
|---|---|---|---|
| Long-term Debt | 52.4% | 7.01% | 3.67% |
| Short-term Debt | 9.0 | 10.71 | 0.96 |
| Preferred Stock | 7.8 | 6.82 | 0.53 |
| Common Equity | 29.0 | 11.40 | 3.31 |
| Deferrals | 1.8 | 0 | 0 |
| | 100.0% | | 8.47% |

The Company's attack focuses, however, upon the Commission's determination of rates of return. Appalachian states that the questions presented for decision are: First, was the Commission's establishment of a rate of return on common equity, and an overall rate of return, unsupported by the evidence or by any rationale in its opinion and, therefore, arbitrary and capricious? Second, did the Commission commit prejudicial error by relying upon a comparison of Appalachian's earnings with the earnings of other subsidiaries of AEP? Third, were the ordered rates unjust and unreasonable and an unconstitutional deprivation of property without due process of law, "if the end result of the Commission's decision leaves Appalachian in a financial position in which it is unable to attract the capital necessary for the proper discharge of its public duties"? The answer to each question is in the negative and we affirm.

---

[3] The Commission General Counsel and its General Attorney represent the appellee.

## I.

The significant rate of return evidence came from three expert witnesses, Herman G. Roseman and Joseph F. Brennan for the Company, and David Parcell for the Commission Staff. Because AEP was Appalachian's sole source of external common equity capital, all three witnesses dealt with AEP's cost of common equity capital.

Roseman discussed the size of AEP's construction budget, the need for external financing, and the need for much of this financing to be in the form of common stock sales. He stated that the price of AEP stock had fallen "greatly," that it was then selling below book value, and that such decline in price was largely due to a higher cost of equity capital stemming from high money costs and increased utility risks. He was of the opinion that AEP "may not" be able to raise the amounts of common equity capital it requires if large and repeated sales of common stock are attempted at market prices significantly below book value per share, thereby diluting[4] the earnings per common share. He emphasized that "no matter how low the current price of the stock goes, the investor will still be unwilling to buy the new shares because the lower price per share he pays now implies a sufficient increase in future dilution in earnings per share that the stock remains an unfavorable purchase."

Roseman further testified that a failure to market common stock would result in a reduction by the utility of its construction program in order to avert financial disaster and, therefore, "inability to raise capital today may be quietly translated into an inability to adequately serve the public a few years down the road." He also stated, assuming the public interest demands that AEP and its subsidiaries avoid drastic reductions in their planned construction program, it was necessary for the rate of return on common equity capital to be at least as great as its cost. This means, he said, that the earnings must be high enough to raise the market price of the stock at least ten per cent above book value, so that common equity capital can be raised in the market without dilution.

Roseman then used a statistical model to estimate the rate of return on common equity capital which would bring AEP's market price to a level ten per cent above book value. This model was a study of

---

[4] "Dilution" occurs, according to Roseman, when a company sells stock at a price below book value, the immediate effect of this sale being to reduce the company's book value per share. He stated that if the company's actual rate of return on book equity does not rise, then the earnings per share will decline, as well as the book value per share.

factors determining the price to book value ratios of 93 electric utilities in mid-1974. The model related "price-book ratios" of the foregoing companies to various characteristics of the companies, including their rate of return on common equity capital. Using this model, Roseman testified that AEP required a 15.42 per cent rate of return on common equity to bring its market price to ten per cent above its book value. He then recommended that Appalachian be allowed a rate of return of at least 9.65 per cent on rate base.

The Commission Staff's witness, Parcell, also focusing on AEP's cost of common equity, testified that regulatory commissions had no obligation to insure that utility stocks sell at a price above book value. He was of opinion that rates of return should reflect the earnings levels of the overall economy and that such rates should permit utilities to attract capital on a competitive basis. He stated that a utility should *earn* its cost of capital. Parcell employed a comparable earnings standard and collated the earnings on common equity during the ten-year period of 1964-1973 of *Moody's* 125 Industrials, a group of the largest manufacturing firms in the United States; three groups of electric utilities, *viz.*, 111 electric utilities regularly appearing in the financial data in *Public Utilities Fortnightly*, *Moody's* 24 utilities, and FPC (Federal Power Commission) Class A & B Electric Utilities; 8 electric utility holding companies of roughly the same size and capital structure as AEP; and 5 independent operating companies with characteristics similar to AEP.

He then concluded that "the range of 12-13 percent allows for a fair rate of return for AEP, and consequently [Appalachian], at the present time." He noted that the "lower portion of this range contains the returns earned by the overall electric utility industry over the past ten years and exceeds the ten year average of the two groups of comparable companies" and that the "lower end also approximates the earnings of *Moody's* 125 Industrials over the past five years." Parcell stated that 8.6 to 8.9 per cent, "centering on 8.75 percent," was Appalachian's "fair rate of return."

Parcell also noted that Appalachian's capital structure was more highly "leveraged" than the normal electric utility. This means, according to Parcell, that Appalachian's capital structure was comprised of a higher percentage of debt capital in relation to common equity capital than other electric utilities. He explained that because debt capital generally has a lower cost than common equity capital and because interest payments are tax deductible and dividend payments are not, the rate of return on equity can be improved through

the use of leverage.[5] Parcell stated that this degree of leverage accounts, in part, for the higher return on equity the AEP System had generally earned in the past relative to the rest of the industry, but that when leverage is utilized to a great extent, resulting in increased stockholder earnings, the company's future expansion may become more inflexible. He pointed out that as interest rates were reaching high levels, increasing Appalachian's fixed interest expense on new debt issues, the new equity market almost "vanished," impairing the Company's flexibility in new financing. Therefore, the coverage problem resulted from the highly leveraged capital structure. This use of leverage, according to Parcell, was the result of a management decision, which in the past, benefited AEP's stockholders. Accordingly, he questioned whether Appalachian's ratepayers should now be forced to pay for this decision when they did not share its benefits in the past.

Brennan, testifying in rebuttal to Parcell, criticized Parcell's use of a comparable earnings test, contended Parcell's reasoning was "circular", claimed Parcell told "but half the story of leverage", and stated that Appalachian's ratepayers had also benefited from its highly leveraged capital structure by paying lower rates in the past. Brennan contended that Parcell gave no weight to the *quality* of earnings in arriving at his recommended rate of return and that Parcell proceeded on the erroneous assumption that "a dollar of reported earnings is worth the same as any other dollar of earnings regardless of quality". He noted that there was then a low level of investor confidence in utility common stock as compared with industrial common stock "precipitated by the Consolidated Edison dividend pass, the high rate of inflation, and related high cost of debt capital, the significant oil and gas price increases, shortages of oil and gas, and shaken confidence in the regulatory process." He concluded that Parcell's recommendation would not permit Appalachian to attract capital on a reasonable basis.

In the majority opinion, the Commission found the amount of Appalachian's request "excessive". It determined that, "[a]fter considering cost of capital and all other factors and applying it to a well adjusted test period . . . [Appalachian] should be given the opportunity to earn an 8.40% rate of return."

The dissenting commissioner was of opinion that an overall rate of return of 9 per cent was proper and that this would afford the

---

[5] The record shows that leverage is a widely accepted financial tool and is used throughout every segment of American industry and commerce.

Company an opportunity to earn a return on its common equity of about 13.2 per cent.

■ Before discussing the sufficiency of evidence issue, we shall dispose of a corollary question raised by Appalachian. It maintains that the content of the majority opinion fails to comply with Code § 12.1-39 which provides, in part, that whenever an appeal is taken from an order of the Commission, the Commission shall file in the record of the case "a statement of the reasons upon which the action appealed from was based." The Company argues that the majority opinion "provides hardly a shred of a clue as to the basis for its decision and certainly fails to provide the statement of reasons mandated by the statute." It relies on *Appalachian Power Co.* v. *Commonwealth*, 132 Va. 1, 110 S.E. 360 (1922), in which neither a complete record nor a statement of reasons for the Commission's action was filed, contrary to a then-existing constitutional provision, and argues that "the majority opinion below is so lacking in any rationale for a determination on the issue of overall rate of return and rate of return on common equity, that the opinion issued should be accorded no greater legal effect than the failure to issue any opinion at all." We do not agree.

In this majority opinion of 18 pages, the author discussed, *inter alia*, the structure of the AEP System and Appalachian's position in it; the issues presented by the application; Appalachian's earnings; the leverage policy; certain accounting adjustments proposed in the proceedings; the majority's conclusions as to cost of capital, rate of return and additional revenue required; and the rate design. While the opinion is nonspecific and inadequately documented in many respects, and is lacking in the detail and quality ordinarily observed in Commission opinions, we have been able to ascertain, albeit with some difficulty, the evidentiary basis for the rate of return allowed by the majority. Using the opinion provided, we have been able to consider and determine whether the action of the Commission was reasonable and just. Accordingly, we cannot say as a matter of law that this opinion fails to comply with the statutory mandate to furnish "a statement of the reasons" for the action of the Commission. *Cf. Roanoke Water Works Co.* v. *Commonwealth*, 137 Va. 348, 364, 119 S.E. 268, 273 (1923); *Petersburg Gas Co.* v. *City of Petersburg*, 132 Va. 82, 110 S.E. 533 (1922).

■ This brings us to a discussion of whether the evidence was legally sufficient to support the Commission's judgment upon rate of return. It must be remembered that in performing the duty of fixing

reasonable and just rates for a public service corporation providing heat, light and power service, the Commission exercises a legislative function delegated to it by the General Assembly by Code § 56-235, under Art. IX, § 2 of the Constitution of Virginia. *Board of Supervisors* v. *VEPCO*, 196 Va. 1102, 1109, 87 S.E.2d 139, 144 (1955). In fixing these rates, there is a reasonably wide area in which legislative discretion is involved. Moreover, there is no "single, scientifically correct rate of return." *Commonwealth* v. *VEPCO*, 211 Va. 758, 769, 180 S.E.2d 675, 683-84 (1971). The Commission must exercise its informed judgment within a zone of reasonableness. *Commonwealth* v. *Portsmouth Gas Co.*, 213 Va. 239, 242, 191 S.E.2d 220, 223 (1972). Accordingly, a rate of return allowed by the Commission may not be set aside as unfair or unjust unless there appears a clear abuse of legislative discretion.

The ultimate finding of the Commission in this case was that Appalachian should be given the opportunity to earn an 8.40 per cent overall rate of return which, Appalachian contends, will produce a rate of return on common equity of only 11.24 per cent. As we shall demonstrate, this judgment of the Commission is within the zone of reasonableness established by the evidence.

The majority obviously accepted to a significant degree the testimony of Staff witness Parcell. As a further examination of his testimony is made, it will be apparent that his analysis, using the comparable earnings approach, supports the Commission's finding, even though the rate of return established was lower than the one recommended by Parcell.

Parcell testified that a utility's securities should be competitive with those of other utilities and, to some degree, with unregulated corporations. He also noted that two major factors, earnings and current money market conditions, affect any company's common stock price, as well as the "interest rate it pays on its debt and its preferred yields." He then proceeded to examine the returns earned by, first, the operating units of the AEP System and, second, other enterprises with similar risks.

In exhibits attached to his prefiled testimony, Parcell showed that for the first nine months of 1974, the AEP electric system, excluding Appalachian, had an average return on common equity of 10.3 per cent; that the average return for the six AEP electric utility subsidiaries, including, of course, Appalachian, for the same period was 11.35 per cent; and that for the eight-year period, 1966 to 1974, the average common equity return for the AEP electric subsidiaries, ex-

cluding Appalachian, was 11.1 per cent. Appalachian's witness Roseman testified that all of the AEP operating subsidiaries should earn the same rate of return on common equity.

Parcell's exhibits then demonstrated that, for the period 1969-1973, rates of return on common equity for the electric utility industry averaged 11.4 per cent; for eight holding companies comparable to the AEP holding company was 10.8 per cent; for five comparable electric companies was 10.9 per cent; for *Moody's* 125 industrials was 12.1 per cent; and was 11.7 per cent for the 93 utilities studied by Appalachian witness Roseman. Appalachian witness Brennan endorsed the use of this five-year period and, in one of his exhibits, showed the average return on common equity of "Ten Barometer Group Companies" for the period to be 11.3 per cent.

Parcell reached two conclusions from his examination of the equity returns which showed that, during the past ten years, industrials had generally earned an equity return in excess of that earned by the electric utilities. He first pointed out that this finding reflected "the recognition and acceptance of the differential of risk and required earnings of electric utilities versus industrials" and, second, "it shows that the free enterprise system and utility regulators have generally recognized and applied the risk-rate of return standard over the past ten years."

In addition, a Parcell exhibit showed the average return on equity for major industrial firms "headquartered" in the AEP service area, excluding Virginia, for the period 1969-1974 was 12 per cent. Another Parcell exhibit showed the return on equity for the same period for major firms in western Virginia was 9.4 per cent.

Parcell further testified that "present" money market conditions were depressed and that all business was feeling the effects of a 12 per cent prime interest rate and a declining stock market. He pointed out that a "recent" survey showed that "75 percent of the nation's leading 900 companies had their common stock selling below book value."

After considering the foregoing comparisons, along with Parcell's testimony that the "lower portion" (12 per cent) of the range of equity return recommended by him is equivalent to the returns earned by the overall electric utility industry over the past decade and that this "lower end" also approximates the earnings of industrials over the past five years, the Commission, taking into account a risk-return differential, was justified in setting an overall rate which would allow a rate of return on common equity as low as 11.24 per

cent. Moreover, the Commission in making its informed judgment obviously considered not only the foregoing rate of return evidence, but other significant evidence, such as the fact that 97 per cent of Appalachian's electricity was generated from coal, of which eleven to twelve per cent was produced by company-owned mines, thereby reducing the risk in the eyes of investors in a period of oil shortages; the fact of Appalachian's favorable and high "load factor", which indicates a greater utilization of total investment in revenue-producing operations; the fact that the Company is located close to coal fields, which reduces its coal transportation costs; and the fact of certain accounting adjustments allowed by the Commission, which will make the Company more attractive to investors.

Accordingly, from an examination of this entire record, we hold that the overall rate of return established in this case is within the "reasonably wide area" of legislative discretion and is therefore not erroneous as a matter of law.

## II.

The Company also argues that it was "prejudicial error for the Commission to rely upon an arbitrary ranking of Appalachian with the other companies in the AEP System". This contention refers to the following excerpt from the majority opinion:

> "Evidence presented in the proceeding indicates that between 1966 and September, 1974, AEP earned approximately 14% on its equity capital. During this same period, [Appalachian] was the highest earning AEP utility subsidiary, averaging 16.6 percent return on its equity. In contrast throughout this period, the overall utility industry earned approximately 12 percent while unregulated industrials earned about 12.5 percent. Consequently, it is fair to conclude that [Appalachian] continually contributed a relatively greater share to AEP system earnings than its sister companies in recent years. I'm concerned that Virginia consumers continually lead the AEP rate parade. By the same token, I know, Virginians are fair-minded and would not expect to bring up the rear. I think their preference would be to pay their fair share and be ranked fourth in the AEP family of seven."

It is apparent, according to Appalachian, that the majority has misapplied the comparable earnings test. It argues that the foregoing quotation shows that the sole basis for the Commission's rate of return conclusion is Appalachian's ranking relative to other AEP subsidi-

aries. It contends the "majority's statement does not reflect an independent determination of a rate of return that is just and reasonable for . . . Virginia consumers and Appalachian." We do not agree.

As we have previously pointed out, the record demonstrates that the Commission has compared returns on investments in enterprises having corresponding risks, that is, the earnings of other utilities and nonregulated companies, and has not restricted its investigation to a comparison of earnings of AEP subsidiary companies only. This is a proper approach in determining just and reasonable rates of return and such approach has been reaffirmed by us recently in *Howell* v. *Chesapeake and Potomac Telephone Co.*, 215 Va. 549, 558, 211 S.E.2d 265, 271 (1975).

### III.

On this record, we cannot accept Appalachian's contention that the "Commission's decision to establish an overall rate of return of 8.40% and a calculated return of 11.24% places the Company in a financial position whereby it cannot raise the additional capital necessary to discharge its statutory duties." This is but a reassertion, in a different context, of the issues discussed in Part I of this opinion and requires no additional elaboration.

For the reasons assigned, the order of the Commission is

*Affirmed.*

HARRISON and COCHRAN, JJ., concurring.

The Commission's rate of return allowance for Appalachian is less than was suggested by its expert witness, Parcell, by the Attorney General of Virginia, and by Commissioner Shannon. We question whether the rate will be sufficient to enable the company to attract the necessary capital to carry out its obligation to render service to the public, an obligation mandated by the Constitution and the statutes of Virginia. However, we recognize the fact that no one can say with precision what is a correct rate of return, and that this determination lies in an area within which the Commission's judgment must be exercised. The Commission is given extensive powers in the control and regulation of public service corporations, and it is charged with the responsibility of finding the facts and making a judgment. Although we would have found differently, the Court is not at liberty to substitute its judgment for that of the Commission in matters peculiarly within the Commission's province. For this reason we concur in the opinion of the majority.