## Richmond

## CENTRAL TELEPHONE COMPANY OF VIRGINIA

v.

## STATE CORPORATION COMMISSION OF VIRGINIA

March 2, 1979.

Record No. 781156.

Present: All the Justices.

*Donald W. Glaves [Ill.]; David Meade White (White & Wood, P.C.; Ross, Hardies, O'Keefe, Babcock & Parsons [Ill.],* on brief), for appellant.

*Edward L. Flippen (Richard D. Rogers, Jr.; Lewis S. Minter,* on brief), for appellee.

HARRISON, J., delivered the opinion of the Court.

On June 15, 1977, Central Telephone Company of Virginia and Southern Telephone Company filed with the State Corporation Commission tariff revisions designed to increase their gross annual revenues $4,667,194 and $262,681, respectively. On April 18, 1978, the Commission authorized additional gross revenue to Central in the amount of $1,600,366, effective May 15, 1978.

Southern's requested increase was approved. Central has noted an appeal of right from this final order.

Southern Telephone Company is a wholly owned subsidiary of Central Telephone of Virginia (Central). Central is 100% owned by Central Telephone Company (Centel), which also owns and operates directly, or through subsidiary companies, telephone properties in seven other states. Centel is 100% owned by Central Telephone and Utilities Corporation, a Kansas corporation, (CTU). The principal officers and organization heads of CTU are also the principal officers and organization heads for Southern, Centel and Central. CTU and most of its subsidiaries purchase telephone related materials and supplies from Central Service Company (Service Company), which was incorporated in 1967, and which is also wholly owned by Centel. CTU owns all of the common stock of two other telephone companies which own and operate properties in Texas and Illinois. CTU also owns and operates electric utility properties in Colorado, and electric, telephone and water properties in Kansas. CTU and its subsidiaries comprise the fourth largest telephone system in the United States. Telephone operations account for approximately 85% of CTU's total operations.

On February 3, 1976, the Commission approved local service tariffs designed to yield Central a 9% rate of return on its investment as of May 31, 1975. An audit by the Commission's staff in 1976 revealed that for the year which ended May 31, 1976, the company did not earn a 9% return and that an additional $2,359,806 in gross annual revenue would be required in order for Central to do so. On October 27, 1976, Central filed an application for an interim increase in local service rates. It sought to impose a temporary surcharge designed to yield the company the deficiency in gross annual revenue which had been found by the Commission's staff. This surcharge was to be collected subject to a refund until the Commission could investigate and arrive at a decision on an application for a permanent increase in rates which Central proposed to file. After investigation and a hearing the Commission found on December 22, 1976, that there was a substantial need for temporary relief and entered its order authorizing Central to impose a 9.60% surcharge, effective January 7, 1977, designed to produce the needed $2,359,806 in additional revenue.

Thereafter, on June 15, 1977, Central and Southern filed with the Commission their applications for a permanent increase in local service rates - tariff revisions - and proposed that the permanent

rates become effective July 15, 1977. However, this date was suspended by the Commission which ordered that public notice be given of the proposed increase in rates. Public hearings on the permanent applications were held on October 19-21, 1977, followed by oral arguments on October 28, 1977. A decision, with Commissioner Bradshaw dissenting, was reached six months later.

The Commission's staff and Central determined Central's rate base, net operating income and rate of return for the twelve months ending December 31, 1976. The Commission accepted this test period for purposes of evaluating Central's filed tariff revisions. Central's rate base as of December 31, 1976, equaled $142,300,571, and its test period net operating income-adjusted equaled $9,814,041. After accounting adjustments, pro forma adjustments, and intrastate separations, the Commission's staff calculated Central's rate base to equal the sum of $107,913,600 and its test period net operating income—adjusted equaled $8,131,678. Central accepted the staff's adjustments with the exception of a pro forma adjustment to the rate base, hereinafter considered, and the associated expense adjustments.

The Commission, having concluded that Central, a subsidiary of CTU, was a part of an integrated telephone service under unified control, determined that CTU's consolidated capital structure and cost of debt were appropriate to use in determining a fair return to Central. Additionally, the Commission found that Central had purchased materials and supplies from its affiliate, Service Company, at unreasonable prices and therefore made a downward adjustment of approximately $1,870,000 to Central's rate base to reflect the extent of the overpayment by Central to Service Company from 1967-1976.

The Commission found that Central was entitled to a return on common equity of 13% and an overall rate of return of 8.34%, the effect of which was to allow Central an increase in gross revenue in the amount of $1,600,366. Central was directed to eliminate the surcharge, to file rates for local service which would generate the gross annual revenue allowed and to file a plan for refunding the revenue collected under the interim surcharge which was in excess of what would have been collected under the allowed permanent rates.

The Commission's order fixing Central's rates was suspended pending Central's appeal, thus leaving the interim rates in effect under bond. While no appeal was taken by Southern, the Office of the Attorney General, Division of Consumer Counsel, noted an

appeal from the Commission's order of April 18, 1978, which raises questions involving Southern, but different from those involved in Central's appeal. *See Commonwealth v. Cen. Tel. Co. of Va.*, 219 Va. 883, 252 S.E. 2d 586 (1979) (this day decided).

Although Central made fifteen separate assignments of error to the Commission's final order, the questions presented on appeal are as follows: (1) Whether in determining a fair rate of return to be allowed Central the Commission may use the consolidated capital structure and consolidated cost of debt of Central's parent corporation, CTU? (2) Whether the Commission was justified in declaring unreasonable and excessive, and excluding from Central's rate base, certain costs incurred by Central since 1967 in purchasing materials and supplies from its affiliate, Service Company? (3) Whether in arriving at Central's rate base the Commission properly excluded certain expenses allocated to Central by CTU following a sale by CTU of gas properties located in Nebraska and South Dakota? and (4) Whether the order of the Commission was retroactive in effect and at variance with its prior orders entered in similar rate cases?

The Commission says that its use of CTU's consolidated capital structure and cost of debt was a matter within its discretion. It maintains that its finding, that an 8.34% rate of return is just and reasonable, was based upon substantial evidence and that therefore its order should be affirmed. Central disagrees and quotes from this Court's opinion in *City of Lynchburg v. Telephone Company*, 200 Va. 706, 720, 107 S.E.2d 462, 472 (1959), as follows:

> It is only when it is made clear by the evidence that the officers and directors are following a policy [with respect to capital structure] in this regard which unreasonably favors the stockholders at the expense of the consumers that the rate-making tribunal should substitute a capital structure radically different from one fashioned by the officers and directors of the corporation.

While Central's equity is indirectly owned by CTU, Central issues its own debt, which is secured by first mortgage bonds on its property in Virginia. On December 31, 1976, Central's capital structure was comprised of 48.78% debt and 51.22% common

equity.[1] Central has no preferred stock. The weighted average interest cost on its outstanding debt as of December 31, 1976, was 7.72%. Central says that historically it has maintained approximately a 50%-50% debt-equity capital structure, and that for the first time the Commission has ignored Central's own capital structure and cost of debt in arriving at the rate of return Central is entitled to earn on its investment. Central argues that the Commission's use of CTU's capital structure and CTU's cost of debt means the rate of return authorized by the Commission will produce a return on equity of only 11.56%, which, it says, is lower than any witness estimated as the lowest cost of attracting equity capital. It further contends that had the Commission used Central's actual capital structure, actual cost of debt and a return on equity of 13%, Central's overall rate of return would have been 8.98%.[2]

Central's expert witnesses, testifying on the fair rate of return and the use of a hypothetical capital structure, were Thomas A. Owens, Jr., the Vice President and Chief Financial Officer of CTU and Central, and Dr. Robert S. Stich, a corporate finance/business

---

[1]

### CAPITALIZATION OF CENTRAL TELEPHONE COMPANY OF VIRGINIA DECEMBER 1976

| Description | Amount | | Percentage of Revenue Earning Capital |
|---|---|---|---|
| DEBT: | | | |
| Long-Term | $60,076,000 | | 48.78 |
| TOTAL | | 60,076,000 | |
| COMMON EQUITY | 59,133,023 | | 48.01 |
| TOTAL | | 119,209,023 | |
| Unamortized Investment Tax Credits Stemming from 1971 Revenue Act | 3,948,804 | | 3.21 |
| TOTAL REVENUE EARNING CAPITAL | | 123,157,827 | 100.00% |
| INTEREST FREE CAPITAL | | 19,802,768 | 13.85 |
| TOTAL CAPITAL | | 142,960,595 | |

[2] Dr. William F. Beazer testified that had the Commission used the corporate structure of Central only, the rate of return would have been 8.54%.

policy professor at the University of Missouri. Dr. William F. Beazer, an economics professor at the University of Virginia, was the Commission's expert. All witnesses, in arriving at a fair return to Central, used the cost of capital method, whereby the cost of attracting debt and equity capital is determined and then applied to an appropriate capital structure. Owens and Stich testified that Central's cost of common equity would be 14.5% to 15%. Both used the weighted average historical cost actually incurred by Central in issuing its outstanding debt, and they used Central's actual capital structure as of December 31, 1976.

Stich, who recommended a 9.9% overall rate of return, said that in finding a cost of common equity capital to the company of 15%, he was influenced by the following factors:

1. The poor earnings performance of the company as compared with the rates of return on average common book equity for the Moody's 125 Industrials, Standard and Poor's 400 Industrials and the FPC Class A and B Electrics.

2. The poor earnings performance of the company as compared with those having Aaa and Aa bond ratings and companies with common stock ranked by Standard and Poor's A+, A, A- and B+.

3. The disenchantment of the investment community with utility securities as demonstrated by analyses of price earnings ratios, market price to book equity ratios and common stock market prices.

4. The likelihood that the company will continue to suffer from attrition of earnings.

Stich said that Central's actual capital structure was reasonable, and that its structure, not the consolidated capital structure of CTU, should be used. He said that the capital structure of a company reflects the basic risks the company faces, and the higher the risk, the less debt there will be in the capital structure.

He pointed out that industrial businesses carry about 30% debt, electric companies about 53% debt, and water companies about 56% debt. His opinion was that a subsidiary's actual capital structure should be used for rate making purposes unless the consolidated capital structure of its parent is more representative of the basic risks of the subsidiary. He stressed that, unlike the Bell System, CTU operates both water and electric companies, and that its telephone companies operate in such diverse areas as Las Vegas, Nevada and rural Minnesota. Therefore, he said, unlike Central, CTU's structure reflects a conglomeration of basic risks due to the operation of differing types of ,utilities as well as a diversity of telephone operations. Stich testified that he did not know of any other Commission that regulated any of CTU's telephone subsidiaries by determining the fair return to the CTU system.

Finally, Central claims that the only reason that could be advanced by the Commission for its position that Central should be authorized a rate of return which it says will generate only a 11.56% return on equity (although the Commission had previously established Central's return on equity at 13%), is that Central's sole stockholder is a corporate conglomerate.

The Commission, in determining Central's rate base for rate of return, relied strongly upon the testimony of Dr. Beazer, which was, in part, as follows:

> In summary, I determined the fair rate of return to be eight point three percent. In reaching this conclusion, I determined the embedded cost of long term debt as of December 31, 1976, to be seven point three seven percent. The cost of short term debt to be seven point five percent, and the cost of preferred stock to be five point eight five percent, and the cost of common equity capital to be twelve point nine percent.

In arriving at this estimate of eight point three percent,[3] I used the actual December 31, 1976 capital structure of the Consolidated Central Telephone and Utility Company composed of fifty-four point nine three percent debt, three point zero five percent preferred stock, and thirty-six point zero one percent common equity. The estimate also took into account CTU's interest-free capital in the amount of twelve point zero one percent of total capital.[4]

---

[3]

## OVERALL RATE OF RETURN
## CENTRAL TELEPHONE COMPANY OF VIRGINIA
### (USING CONSOLIDATED CTU CAPITAL STRUCTURE)

| Item | Percent of Capitalization | Cost | Unadjusted Cost | Adjustment Factor | Weighted Cost |
|---|---|---|---|---|---|
| Long-Term Debt | 54.48 | 7.37 | 4.02 | .88 | 3.53 |
| Short-Term Debt | 0.45 | 7.50 | .03 | .88 | .03 |
| Common Equity (Including Tax Credits) | 39.06 | 12.9 | 5.04 | .88 | 4.43 |
| Preferred Equity | 6.00 | 5.85 | .35 | .88 | .31 |
| Total | | | | | 8.30 |

[4]

## CAPITALIZATION OF CONSOLIDATED CENTRAL
## TELEPHONE AND UTILITIES CORPORATION
### December 1976

| Description | Amount | | Percentage of Revenue Earning Capital |
|---|---|---|---|
| DEBT: | | | |
| Long-Term | $539,975,434 | | 54.48 |
| Short-Term | 4,500,000 | | .45 |
| TOTAL | | 544,475,434 | |
| COMMON EQUITY | 356,879,597 | | 36.01 |
| PREFERRED STOCK | 59,470,043 | | 6.00 |
| TOTAL | | 960,825,074 | |
| Unamortized Investment Tax Credits Stemming from 1971 Revenue Act | 30,272,253 | | 3.05 |
| TOTAL REVENUE EARNING CAPITAL | | $991,097,327 | 100.00% |

| | | | PERCENTAGE OF TOTAL CAPITAL |
|---|---|---|---|
| | | | 12.01 |
| INTEREST FREE CAPITAL | $135,278,663 | | |
| TOTAL CAPITAL | | $1,126,375,990 | |

\* \* \* \* \*

The cost of each type of capital is weighted by the appropriate percentage of capital structure and then summed to obtain the average cost of capital. This cost is then adjusted to take account of the interest-free capital.

The capital structure of the Consolidated Central Telephone and Utility Company is the appropriate capital structure, because Central of Virginia is wholly owned by CTU, and the preferred and common equity of CTU is the only stock that is held by the public.

It is this publicly held stock plus the publicly held debt of the consolidated company that has an ultimate claim on the earnings of the Central Telephone Company of Virginia.

Dr. Beazer testified that decisions relating to the capital structure of CTU's wholly owned subsidiaries are made by CTU officials, and that the capital structure of Central is discretionary with CTU management; that while Central may issue its own debt, as is the case with AT & T subsidiaries, it is the CTU management, like the AT & T management, which first decides whether to raise capital through the subsidiary or the parent corporation; and that Central does not act as an autonomous corporate entity because CTU and its subsidiaries are essentially one organization.

Dr. Beazer said that the diversity of operations of the subsidiary companies of CTU was irrelevant. He testified that a diversified operation by a "headquarters company" could include "[o]ne, a telephone operating entity, the other an electric utility operating entity. The capital structure for the two would be the same, but the rate of return allowed on each of those operations might be quite different. . . . And if each of those operations were regulated, then there would presumably be different allowed rates of return to take into account the risk associated with each of those kind of operations".

There is no substantial disagreement between the Commission and Central over the cost factors for long-term debt and preferred

stock. The major capital cost item in controversy was the proper cost rate for common equity. Stich and Owens said the rate should be in the range of 14.5% to 15%. Beazer recommended 12.9%. The Commission observed: "This range serves to underscore our frequently repeated observation that the different techniques of measuring the cost of equity capital can provide, at best, only a useful guide for determining the fair rate of return." It then proceeded, employing CTU's consolidated capital structure, to determine the cost of capital for Central to be 8.34%, saying this weighted cost equates to a return of 13% on common equity. It was the Commission's judgment that such a return would provide Central with the opportunity to earn a just and reasonable rate of return.[5]

■ The basic principles governing a judicial review of a State Corporation Commission's order fixing rates and charges for a public utility have been often stated in opinions of this Court and can be summarized as follows: The Commission is required by the Constitution and by statute to fix rates which shall be just and reasonable. In the performance of its rate fixing responsibilities, the Commission exercises a legislative function, delegated to it by the General Assembly of Virginia, which involves a reasonable amount of discretion. There is no single scientific correct rate of return, and the rate the Commission fixes may not be changed or set aside as confiscatory or unreasonable unless it clearly evinces an abuse of legislative discretion. The Commission functions as an expert tribunal and its order, upon review, is presumed to be just, reasonable and correct. Va. Const., Art. 9, §2; Va. Code §56-235; *Appalachian Power Co.* v. *Commonwealth*, 216 Va. 617, 221 S.E.2d 872 (1976); *Howell* v. *C & P Tel. Co. of Va.*, 215 Va. 549, 211 S.E.2d 265 (1975); *Commonwealth* v. *Portsmouth*, 213 Va. 239, 191 S.E.2d

---

[5]Commissioner Bradshaw, in his dissenting opinion, said that the Commission had never before used CTU's consolidated capital structure when determining the fair return to Central and further observed:

This approach predisposes that the Bell System and C.T.U., the parent Company are similiar. The facts do not bear this out. C.T.U. not only operates telephone companies which are not an integrated system as Bell, but also operates electric utilities and water companies in other states. Suppose the out-of-state electric plant suffered a $10 million loss as a result of a flood or the foreign water company, by some freak accident, became contaminated with kepone or some other substance resulting in a $10 million loss, would the majority expect Virginia telephone ratepayers to subsidize this loss? I hope not. Additionally, to use the consolidated capital structure of C.T.U. would require this Commission to increase consumer cost by the employment of many additional auditors. This is not justified.

220 (1972); *City of Lynchburg v. Telephone Company*, 200 Va. 706, 107 S.E.2d 462 (1959); *Board of Supervisors v. VEPCO*, 196 Va. 1102, 87 S.E.2d 139 (1955).

No useful purpose would be served by a more detailed analysis of the figures and procedures used by the numerous witnesses. We have referred to the differences of opinion and the different conclusions reached by the respective experts on rate making. The ultimate finding of the Commission was that Central should be given the opportunity to earn an 8.34% overall rate of return. There is little controversy over the appropriate base to be used in determining Central's rate of return, and the Commission's approval of a 13% return on equity was not assigned by Central as error. Rather, Central's principal complaint concerns the action of the Commission in adopting a "hypothetical" capital structure and a "hypothetical" cost of long-term debt without a finding of unreasonableness with respect to Central's actual capital structure and actual cost of debt.

Therefore, the principal issue in this case is whether, under the Constitution of Virginia and under applicable and implementing statutes, it is within the legislative discretion of the Commission to begin using the capital structure of CTU, rather than the capital structure of Central which it formerly used, to determine the fair rate of return applicable to the intrastate operations of Central.

In effect, the Commission rejected the analysis and recommendations made by Central's expert witnesses and followed the recommendations of its own staff and of its own expert, Dr. Beazer. It said:

> Central and the other CT&U subsidiaries are parts of an integrated system of operations, under unified control. Although both CT&U and Central issue debt securities, this is a matter of corporate strategy and discretion for CT&U, and should be considered part of the overall capitalization. The costs of capital for CT&U are based upon its appraisal as a total enterprise by the capital market. If we consider the market's appraisal of CT&U in determining the cost of equity capital for Central, and recognize that the primary source of funds to Central, as well as to the other CT&U subsidiaries, derives largely from a common

source, it follows that CT&U's capital structure should be employed in determining Central's rate of return.

The use of the consolidated capital structure of a parent corporation in a case where the rate of its subsidiary is being considered is not without precedent. In *Norfolk v. Chesapeake, etc., Tel. Co.*, 192 Va. 292, 318, 64 S.E.2d 772, 787 (1951), we said:

> Appellee is a wholly owned subsidiary of the American Company and is financed as an integral part of the Bell System. It obtains needed capital from the American Company upon its debt and equity obligations and that Company, in turn, secures it from the investing public by sale of its debt obligations and stock. The significance of the ratio of debt obligation to that of equity obligation has in this instance to do immediately with the Company for the Commission is fixing a just rate of return for appellee and the public it serves and not for the Bell System or the American Company. However, as it is by the means stated and as an integral part of the Bell System that appellee acquires needed capital from the American Company the ratio of debt to equity obligations of the Bell System (and of appellee as a unit therein) must be kept in mind when the Commission undertakes to fix a just rate of return.

*See also City of Lynchburg v. Telephone Company, supra.*

More recently, in *Howell v. C & P Tel. Co. of Va., supra*, there were intervenors who contended that the Commission was restricted to economic factors existing wholly within the state when considering cost of money. We rejected this contention and said:

> Following established rate making procedures, the Commission examined *intrastate* rate base, *intrastate* revenues and *intrastate* expenses. Then it determined a fair rate of return for C & P's *intrastate* business, by

considering evidence showing the Bell System's nationwide experience. C & P was properly treated as a "miniature Bell System." *City of Lynchburg v. Telephone Company, supra,* 200 Va. at 718, 107 S.E.2d at 471.

The Commission's approach follows the principle that the return to the equity owner should correspond with returns on investments in other businesses having corresponding risks, and the return "should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." *Federal Power Commission v. Hope Natural Gas,* 320 U.S. 591, 603 (1944). Accordingly, in this case consideration of merely local, and even regional, rate of return evidence would have been inappropriate. When establishing a figure which "will afford the utility reasonable opportunity to earn a fair and just return on its investment," a nationwide perspective is necessary and was appropriate in this case. 215 Va. at 558, 211 S.E.2d at 271.

In *Appalachian Power Co.* v. *Commonwealth, supra,* we reviewed an order of the Commission involving a subsidiary of the American Electric Power Company, Inc., a public utility holding company. American Electric Power Company's subsidiaries, which were electric utility operating companies, marketed their preferred debt and long-term debts directly. There, we said:

The evidence showed that a knowledge of the AEP System is important because: (1) an understanding of the system's operating and funding procedures is an aid in determining the appropriate capital structure for rate making purposes; (2) the same factors are useful in establishing the cost of the subsidiaries' debt and equity capital; (3) the relative earnings levels of the several subsidiaries provide an indication as to the strength of the various links in the system; and (4) from the foregoing

information, the overall system earnings requirements and, in addition, the financial needs of the several subsidiaries, can be discerned. 216 Va. at 620-21, 221 S.E.2d at 875.

We are not unmindful that in previous cases involving Central, one as recent as 1976, the Commission based the rate of return upon the capital structure and cost of debt to Central. Neither are we unmindful that Central's capital structure is not out of line with that of other telephone companies. However, a utility company has no vested right to demand that any particular method be used by a regulatory body in determining its rate of return. In the instant case the State Corporation Commission has determined that CTU's consolidated capital structure and cost of debt, rather than Central's capital structure and cost of debt, is a more appropriate vehicle for it to use to determine a fair and reasonable rate of return for Central.

In essence, what the Commission has decided is that because Central is a wholly owned subsidiary of CTU, and is wholly controlled by the parent corporation, it is fairer and more reasonable to use the capital structure of the parent rather than the subsidiary.

We are not persuaded in this instance of either the necessity or the desirability of this change in method made by the Commission or of the soundness of the reasons assigned for the change. However, we cannot say that the method adopted by the Commission is in violation of the Constitution of Virginia or of any statute, or that the rate allowed is confiscatory or unreasonable and unjust. Whether or not the Commission has acted wisely is open to question, but that it acted within its discretion is not. We say again, "We do not sit as a board of revision to substitute our judgment for that of the legislature, or of the Commission lawfully constituted by it, as to matters within the province of either." *C. & P. Co. of Va.* v. *Com. of Va.*, 147 Va. 43, 57, 136 S.E. 575, 578, quoting from the *Minnesota Rate Cases*, 230 U.S. 433 (1912).

The Commission, as a regulatory body, is fully conscious of its mandated duty to authorize a fair and reasonable rate of return based upon its informed and impartial judgment; and that "[s]uch judgment must be coupled with the underlying objective of providing the consumer with the lowest rate possible, consistent with protecting the utilities' capability of providing efficient, adequate

and reliable service and maintaining its financial integrity".[6] We cannot hold here that this underlying objective cannot be attained by using the methodology adopted by the Commission.

We now turn to Central's assignment of error which questions the action of the Commission in reducing Central's rate base predicated upon a determination made by the Commission's staff that prices paid over a ten-year period by Central to Service Company were unreasonable.

Central purchases standard materials and supplies from Service Company. By reason of inventories maintained by Service Company in its warehouse facilities in Virginia, Central is able to maintain a smaller purchasing department and a smaller inventory of supplies than would otherwise be required. Additionally, it obtains faster delivery than it would ordinarily get from other sources. Central claims that it saves money because the prices it pays are often lower and are in no event higher than those from other suppliers from which Central could purchase. Also Central receives 48% of Service Company's profits to use as cost free capital. Central argues that it is expected to and often does purchase from unaffiliated suppliers when it can do so more cheaply.

The reasonableness of Central's dealings with Service Company had been demonstrated to the satisfaction of the Commission in previous rate cases. Central points to an order of the Commission, dated July 2, 1976, issued under the Public Utility Affiliate Law (Title 56, Chapter 4, Code of Virginia). There it was found that Central's transactions with Service Company were not inconsistent with the public interest, provided that Central sought the Commission's approval before making a single purchase for more than $75,000, and that, for items over $5,000, Central filed an annual report comparing prices paid to Service Company with those of Service Company's competitors. At that time no question was raised by the Commission regarding the profits earned by Service Company.

Central further cites its 1973 rate case in which there was evidence of the earnings of Service Company from 1967 through 1973. There, the Commission made no adjustment for excess

---

[6]Language employed by the State Corporation Commission of Virginia in its findings and order entered February 3, 1976, on application of Central Telephone Company of Virginia (Case No. 19556).

profits earned by Service Company even though the evidence and arguments were essentially the same as are now being advanced.

In the instant case the Commission found that "in view of Service Company's affiliate relationship with Central, Service Company's prices should be deemed excessive to the extent that such prices yield to Service Company a return on investment greater than the rate of return the Commission finds to be allowable to Central itself". The Commission then proceeded to adjust Central's rate base downward by $1,870,000 to reflect the amount Central had allegedly overpaid Service Company. The adjustment was calculated by determining Service Company's return on investment for the years 1967-1976, inclusive, and subtracting therefrom the overall return allowance found reasonable by the Commission for Central for the same period. The Commission found that 8.5%, the average return allowance for Central and its predecessors, Lee Telephone Company and Virginia Telephone and Telegraph Company, provided an appropriate and reasonable measure by which to determine the level of excess earnings of Service Company. It then found that the difference between the 8.5% average return and Service Company's return on investment equated to a rate it deemed excessive.

We are unwilling to approve this action of the Commission. While it is the duty of the Commission to scrutinize prices paid by a utility to an affiliated supplier, we find no evidence in this case that the expenses incurred by Central in the purchase of its supplies were exorbitant, unnecessary, wasteful, extravagant or incurred in the abuse of discretion or in bad faith. *Norfolk v. Chesapeake, etc., Tel. Co.*, 192 Va. 292, 312, 64 S.E.2d 772, 784 (1951). On the contrary, there is affirmative evidence that the prices paid by Central were as reasonable as it could have obtained elsewhere. Further, the policy followed by Central and its predecessor companies in purchasing supplies was a matter previously explored by Central with the Commission in prior rate cases.

We observe that there is no evidence of any advantage taken by Central of its affiliated relationship with Service Company to the detriment of Central and its customers. Neither is there evidence that Service Company, in its affiliated relationship with Central, enjoys a unique position of market power which renders a comparison of prices and profits with those of other suppliers inadequate as a measure of reasonableness.

We agree with Commissioner Bradshaw's dissent that the Commission acted erroneously when it reduced Central's rate base to

reflect alleged excess profits realized over a ten-year period by Service Company from its dealings with Central. We do not question the duty of the Commission to determine what expenditures by a telephone company for equipment are reasonable, and in so doing to determine if an affiliate supplier's profit margin is excessive or that the prices charged are higher than those charged by a competing supply company. However, the adjustment made was not indicated under the circumstances existing in the case under review.

■ Central further took exception to the action of the Commission in excluding from Central's operating expenses an increase allegedly caused by a reallocation of an expense item of $67,464 from Central's parent corporation. During 1976 CTU sold certain of its gas properties located in Nebraska and South Dakota, and thereafter reallocated among its various subsidiaries certain expenses formerly charged to the gas operation. Most of the expenses involved salaries for accountants and financial experts which Central alleges provide services to all CTU subsidiaries. It says that the sharing of these expenses is one of the benefits to Central of belonging to the CTU System. Central argues that the Commission ignored the evidence. The Commission says there was a lack of proper supporting evidence suggesting the source of the reallocated expenses, the reasonableness thereof or the increased benefit Central received as a result of the increase in charges by the parent company. The Commission has resolved this controverted issue of fact and disallowed the proposed allocation. We cannot say its action was improper as a matter of law or represents an abuse of discretion.

■ Finally, Central complains that the Commission erred in disregarding its own well-established precedents. While it is true that the Commission did make a finding in the instant case which had no counterpart in prior Central rate cases, we do not agree that this constituted retroactive rate making. It is well-established that the Commission possesses the authority to change or modify prior regulatory decisions, and that such changes are frequently made to meet changing conditions or conditions not previously recognized. The ultimate in any rate making case is that a fair and reasonable rate of return be determined, not the *modus operandi* by which the conclusion is reached. We are not at liberty to interfere so long as the method employed is not prohibited by the Constitution or by statute.

We therefore affirm the order of the Commission except insofar

as it adjusted Central's rate base downward to reflect the amount the Commission found that Central overpaid Service Company for the years 1967-76. This cause is remanded for such further proceedings by the Commission as are indicated consistent with this opinion.

*Affirmed in part,*
*reversed in part,*
*and remanded.*