JUSTICE MIMS, dissenting.
 

 "Subject to such criteria and other requirements as may be prescribed by law, the [State Corporation] Commission shall have the power and be charged with the duty of regulating the rates, charges, and services and, except as may be otherwise authorized by the Constitution or by general law, the facilities of railroad, telephone, gas, and electric companies." Va. Const. art. IX, § 2.
 

 This case boils down to a simple question: what does that sentence mean? The majority holds that it means the General Assembly may suspend the Commission's power and duty to set rates for electric companies. I disagree. I reject the premise that the rate-making authority granted to the Commission
 by the Constitution is subordinate to the General Assembly. Article IX, § 2 allows the legislature to control the general aspects of rate-making by establishing, by statute, standards and prerequisites for the Commission's exercise of its constitutional power. Article IX, § 2 does not empower the General Assembly to suspend the Commission's constitutionally-conferred rate-making authority. I therefore must respectfully dissent.
 A. THE CASE ON WHICH THE MAJORITY PRINCIPALLY RELIES WAS WRONGLY DECIDED AND SHOULD BE OVERRULED, STARE DECISIS NOTWITHSTANDING
 

 1. THE COURT INCORRECTLY CONSTRUED ARTICLE IX, § 2 IN 1974
 

 The majority principally relies on our precedent in
 
 Commonwealth v. Virginia Electric & Power Co.
 
 (
 
 VEPCO 1974
 
 ),
 
 214 Va. 457
 
 ,
 
 201 S.E.2d 771
 
 (1974). In that case, VEPCO filed an application for a declaratory judgment that the Commission was empowered to regulate retail rates for services provided to government entities.
 
 Id.
 
 at 459,
 
 201 S.E.2d at 772-73
 
 . Among the questions raised was whether Article IX, § 2 of the Constitution of Virginia of 1971 prohibited the General Assembly from interfering with the Commission's power and duty to set electric rates.
 
 Id.
 
 at 464,
 
 201 S.E.2d at 776
 
 . The Court held that it did not for two reasons.
 

 First, the Court rejected VEPCO's assertion that the clause "[s]ubject to such criteria and other requirements as prescribed by law" merely reserved to the General Assembly the power to prescribe procedural rules for the Commission. The Court noted that Article IX, § 3 expressly provided that "[t]he Commission may prescribe its own rules of practice and procedure not inconsistent with those made by the General Assembly. The General Assembly shall have the power to adopt such rules, to amend, modify, or set aside the Commission's rules, or to substitute rules of its own." The Court held that if the "subject to" clause from Article IX, § 2 meant only that the General Assembly could prescribe procedural rules for the Commission, as VEPCO argued, the "subject to" clause and the "rules of practice and procedure" sentences in Article IX, § 3 would be redundant, and such an interpretation is impermissible.
 
 Id.
 
 at 464-65,
 
 201 S.E.2d at 776
 
 .
 

 Second, it rejected VEPCO's assertion that Article IX, § 2 allowed the General Assembly to overrule the Commission when it came to the regulation of railroad, telephone, gas, and electric
 
 facilities
 
 , but not when it came to regulating their rates, charges,
 and services.
 
 [1]
 
 Regarding the Commission's regulation of rates, charges, and services, VEPCO argued, the Constitution permitted the General Assembly only to dictate "the method" by which the Commission acted. The Court disagreed and held that what VEPCO described as " 'the method' " was fully encompassed by the words "[s]ubject to such criteria ... as may be prescribed by law," which, again, would impermissibly make the words "and other requirements" redundant.
 
 Id.
 
 at 465,
 
 201 S.E.2d at 776-77
 
 .
 

 The Court's conclusion in
 
 VEPCO 1974
 
 that "the authority of the [Commission] to regulate the rates charged by electric companies ... is subordinate to the power of the General Assembly to command otherwise,"
 
 id.
 
 at 465,
 
 201 S.E.2d at 777
 
 , is the foundation for the majority's holding today that Code § 56-585.1:1 does not contravene Article IX, § 2. The majority's position is certainly reasonable:
 
 VEPCO 1974
 
 is long-established precedent. Nevertheless, I believe it was wrongly decided. Upon careful consideration, I conclude that VEPCO was correct in 1974 when it asserted that the Commission's constitutional authority to set electric rates could not be superseded by statute. Because the Court's error is one of constitutional interpretation, stare decisis must yield to a detailed re-examination.
 

 The principal defect in the
 
 VEPCO 1974
 
 decision is its selective view of which provisions
 would be impermissibly made redundant. For example, by choosing to reject VEPCO's second argument because it would (in the Court's view) give the words "criteria" and "requirements" the same meaning and thereby impermissibly make them redundant, the Court ruled that "any difference between [the 'subject to' clause and the 'except as' clauses] becomes insubstantial."
 
 Id.
 
 at 465,
 
 201 S.E.2d at 776
 
 . In other words, the Court adopted the position that the "subject to" and "except as" clauses had the same meaning-and therefore were redundant-but that the words "criteria" and "requirements" could not have the same meaning because they would then be impermissibly made redundant. This interpretation is indefensible.
 "It is a general rule that the words of a Constitution are to be understood in the sense in which they are popularly employed, unless the context or the very nature of the subject indicates otherwise."
 
 Howell v. McAuliffe
 
 ,
 
 292 Va. 320
 
 , 368,
 
 788 S.E.2d 706
 
 , 734 (2016) (internal quotation marks omitted),
 
 cert. denied sub nom.
 

 Manship v. McAuliffe
 
 , --- U.S. ----,
 
 137 S.Ct. 657
 
 ,
 
 196 L.Ed.2d 548
 
 (2017). "In interpreting [constitutional] text, we are guided by the principle that the Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning. Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings...."
 
 District of Columbia v. Heller
 
 ,
 
 554 U.S. 570
 
 , 576-77,
 
 128 S.Ct. 2783
 
 ,
 
 171 L.Ed.2d 637
 
 (2008) (internal quotation marks, citations, and alteration omitted).
 

 "Criterion" means "a standard on which a decision or judgment is based." Webster's Third New International Dictionary 538 (1993). "Requirement" means "a requisite or essential condition."
 
 Id.
 
 at 1929. The definitions themselves are sufficient to show that the two words are not the same, and therefore are not redundant. However, that conclusion sheds little light on what they mean. "Words, like syllables, acquire meaning not in isolation but within their context. [Someone] looking up the separate word 'foreign' in a dictionary might ... interpret the phrase 'I have a foreign object in my eye' as referring, perhaps, to something from Italy."
 
 K Mart Corp. v. Cartier, Inc.
 
 ,
 
 486 U.S. 281
 
 , 319,
 
 108 S.Ct. 1811
 
 ,
 
 100 L.Ed.2d 313
 
 (1988) (Scalia, J., concurring in part and dissenting in part).
 

 Read in context within Article IX, § 2's "subject to" clause, the meaning of "such criteria and other requirements" is unambiguous: it means the standards the Commission must consider while setting a rate and the prerequisites the Commission must fulfill before it does so.
 
 See
 
 Webster's Third New International Dictionary,
 
 supra
 
 , at 1791 (defining "prerequisite" as "something that is required"-i.e., a requirement-"beforehand"). These are two separate concepts: what must the Commission consider when deciding, and what must the Commission do before it decides.
 
 [2]
 

 The "subject to" clause means that the General Assembly may impose standards and prerequisites that the Commission must adhere to when exercising its power and duty to set rates. It does not mean that the General Assembly may suspend that power and duty. By contrast, the "except as" clause (which is also unambiguous)
 
 does
 
 permit the General Assembly to eliminate or reassign the Commission's power and duty to regulate
 
 facilities.
 
 Read in context, the meaning of the two clauses is clear. First, "[s]ubject to such [standards] and other [prerequisites] as may be prescribed by law, the Commission shall have the power and be charged with the duty of regulating the rates, charges, and services ... of
 railroad, telephone, gas, and electric companies." Second, "the Commission shall have the power and be charged with the duty of regulating" "the facilities of railroad, telephone, gas, and electric companies," "except as may be otherwise authorized by this Constitution or by general law." Because these two clauses have different meanings and effects, they cannot be redundant. The Court therefore erred in
 
 VEPCO 1974
 
 by giving them the same meaning. It was incorrect in light of both the plain meaning of the words used and the structure of the sentence. Making them redundant is also impermissible.
 

 Similarly, the "subject to" clause in Article IX, § 2 has a different meaning and effect from the "rules of practice and procedure" sentences in Article IX, § 3. "Such criteria and other requirements" are not the same as "rules of practice and procedure." "Criteria and other requirements" to engage in rate-making are obligations
 
 the Commission
 
 must satisfy; "rules of practice and procedure" include obligations
 
 those appearing before the Commission
 
 must satisfy.
 
 [3]
 

 This substantive difference between Article IX, §§ 2 and 3 is illustrated by comparing the actual requirements set out in § 156(b)
 

 of the Constitution of 1902 and the Commission's current rules of practice and procedure. The former provided that
 

 [b]efore the commission shall prescribe or fix any rate, charge, or classification of traffic, and before it shall make any order, rule, regulation or requirement directed against any one or more companies by name, the company or companies to be affected by such rate, charge, classification, order, rule, regulation or requirement, shall first be given, by the commission, at least ten days' notice of the time and place, when and where the contemplated action in the premises will be considered and disposed of, and shall be afforded, a reasonable opportunity to introduce evidence and to be heard thereon, to the end that justice may be done, and shall have process to enforce the attendance of witnesses....
 

 Constitution of Virginia § 156(b) (1902).
 
 [4]
 
 This requirement has now been reduced to an obligation to provide "reasonable notice of the time and place at which [a party] shall be afforded an opportunity to introduce evidence and be heard." Va. Const. art. IX, § 3. It is certainly within the General Assembly's Article IX, § 2 power to require by statute that such "reasonable notice" consist of at least ten days' notice, as the former constitution did.
 

 By contrast, the Commission's rules of practice and procedure require, for example, that "[e]ach document must be filed on standard size white opaque paper, 8-½ by 11 inches in dimension, must be capable of being reproduced in copies of archival quality, and only one side of the paper may be used. Submissions filed electronically shall be made in portable document format (PDF)." 5 VAC § 5-20-150. This obligation is imposed on those who file documents with the Commission, not on the Commission itself. Thus, while "rules of practice and procedure" may also include "criteria and other requirements," the former address more subjects and in greater detail than the latter, and they operate on different objects. Thus, because the "subject to" clause in Article IX, § 2 does not have the same meaning as the "rules of practice and
 procedure" sentences in Article IX, § 3 when examined in context, they cannot be impermissibly made redundant.
 

 Consequently,
 
 VEPCO 1974
 
 was wrongly decided because both pillars of its rationale are flawed. The "subject to" clause has a clear, unambiguous meaning that does not duplicate either the "except as" clause that follows it or the "rules of practice and procedure" sentences in Article IX, § 3.
 

 VEPCO 1974
 
 's interpretation of Article IX, § 2 therefore should be overruled.
 

 2. PRECEDENT MUST NOT BE OVERRULED LIGHTLY, BUT IT MUST GIVE WAY WHEN IT IS IN ERROR
 

 I "recognize the importance of the doctrine of stare decisis in our jurisprudence,"
 
 Nunnally v. Artis
 
 ,
 
 254 Va. 247
 
 , 252,
 
 492 S.E.2d 126
 
 , 128 (1997), but it "is only an adjunct of our duty as judges to decide by our best lights what the Constitution means. It is not an inexorable command."
 
 McDonald v. City of Chicago
 
 ,
 
 561 U.S. 742
 
 , 812,
 
 130 S.Ct. 3020
 
 ,
 
 177 L.Ed.2d 894
 
 (2010) (Thomas, J., concurring in part and dissenting in part) (internal quotation marks and citation omitted). "Our strong adherence to [it] does not ... compel us to perpetuate what we believe to be an incorrect application of the law."
 
 Nunnally
 
 ,
 
 254 Va. at 253
 
 ,
 
 492 S.E.2d at 129
 
 . In the words of our senior colleague, "[t]here is no reason why an error, once committed, should be enshrined forever, to the detriment of future generations, like Sir Francis Bacon's proverbial fly in amber."
 
 Homeowners Warehouse, Inc. v. Rawlins
 
 , 242 Va. XIII, XVII,
 
 409 S.E.2d 115
 
 , 117 (1991) (per curiam) (Russell, J., dissenting.) "Indeed, this Court's obligation to reexamine critically its precedent will enhance confidence in the judiciary and strengthen the importance of stare decisis in our jurisprudence. Although we have only done so on rare occasions, we have not hesitated to reexamine our precedent in proper cases and overrule such precedent when warranted."
 
 Nunnally
 
 ,
 
 254 Va. at 253
 
 ,
 
 492 S.E.2d at 128
 
 .
 

 I believe that
 
 VEPCO 1974
 
 is such a case.
 

 B. THE COMMISSION EXERCISES A LEGISLATIVE FUNCTION WHEN SETTING RATES, BUT ITS POWER TO DO SO IS NO LONGER DELEGATED BY THE GENERAL ASSEMBLY
 

 The majority quotes five cases for the proposition that when setting rates, the Commission exercises a legislative power delegated to it by the General Assembly. Although each case was
 decided after 1971, they all trace their origins to 1955. After the adoption of the Constitution of 1971, the proposition must be re-examined. I believe that such re-examination reveals that the proposition is no longer valid.
 

 The five cases are
 
 Virginia Electric & Power Co. v. State Corporation Commission
 
 (
 
 VEPCO 2012
 
 ),
 
 284 Va. 726
 
 , 741,
 
 735 S.E.2d 684
 
 , 691 (2012) ;
 
 Potomac Edison Co. v. State Corporation Commission
 
 (
 
 Potomac Edison II
 
 ),
 
 276 Va. 577
 
 , 587,
 
 667 S.E.2d 772
 
 , 777 (2008) ;
 
 Commonwealth ex rel. Division of Consumer Counsel v. Potomac Edison Co.
 
 (
 
 Potomac Edison I
 
 ),
 
 233 Va. 165
 
 , 170-71,
 
 353 S.E.2d 785
 
 , 788 (1987) ;
 
 Old Dominion Power Co. v. State Corporation Commission
 
 ,
 
 228 Va. 528
 
 , 532,
 
 323 S.E.2d 123
 
 , 125 (1984) ; and
 
 Appalachian Power Co. v. Commonwealth
 
 ,
 
 216 Va. 617
 
 , 626,
 
 221 S.E.2d 872
 
 , 878 (1976).
 
 VEPCO 2012
 
 cites
 
 Potomac Edison II
 

 .
 
 That case in turn cites
 
 Potomac Edison I
 
 ,
 
 Old Dominion
 
 , and
 
 Central Telephone Co. v. State Corporation Commission
 
 ,
 
 219 Va. 863
 
 , 874,
 
 252 S.E.2d 575
 
 , 581 (1979).
 
 [5]
 

 Potomac Edison I
 
 simply quotes
 
 Old Dominion
 

 .
 

 Old Dominion
 
 cites
 
 Central Telephone.
 
 That case cites
 
 Appalachian Power
 
 and
 
 Board of Supervisors of Arlington County v. Virginia Electric & Power Co.
 
 (
 
 VEPCO 1955
 
 ),
 
 196 Va. 1102
 
 , 1109,
 
 87 S.E.2d 139
 
 , 144 (1955).
 
 [6]
 

 Appalachian Power
 
 also cites
 
 VEPCO 1955
 

 .
 

 Consequently, despite the number of cases the majority cites, they all depend on a single statement that predates the Constitution of 1971. It is true that
 
 Potomac Edison II
 
 ,
 
 276 Va. at 587
 
 ,
 
 667 S.E.2d at 777
 
 ,
 
 Central Telephone
 
 ,
 
 219 Va. at 874
 
 ,
 
 252 S.E.2d at 582
 
 , and
 
 Appalachian Power
 
 ,
 
 216 Va. at 626
 
 ,
 
 221 S.E.2d at
 
 878 each cite Article IX, § 2 alongside the cases identified above, but none of them explain how that
 
 constitutional
 
 provision can possibly represent a delegation of power by the
 
 General Assembly
 
 , rather than by the
 
 people of Virginia
 
 who adopted it.
 

 To the contrary, in
 
 Howell
 
 , in 1975, the Court stated that when it undertakes the legislative function of rate-making, "the Commission is the legislative branch of government" and that it "enjoys the full legislative power of the State." 215 Va. at 557, 211 S.E.2d at 270. It cited for these statements
 
 City of Norfolk v. Chesapeake and Potomac Telephone Co.
 
 (
 
 C&P
 
 ),
 
 192 Va. 292
 
 , 300,
 
 64 S.E.2d 772
 
 , 776 (1951). In
 
 C&P
 
 , the Court quoted
 
 Norfolk & Western Railway Co. v. Commonwealth
 
 ,
 
 162 Va. 314
 
 , 322,
 
 174 S.E. 85
 
 , 88 (1934), which held that "[i]n proceedings relating to the establishment of rates and charges for transportation and transmission companies," the Commission "is
 
 the
 
 legislative branch of the government." (Emphasis in original.)
 

 Obviously,
 
 C&P
 
 and
 
 Norfolk & Western
 
 predate the Constitution of 1971. However, they involve a telephone company, which is a transmission company within the definition supplied by § 153 of the Constitution of 1902, and a railway company, which is a transportation company within the definition supplied by the same
 section. Therefore, in both cases, the Commission's rate-making authority was conferred directly by the Constitution of 1902 through § 156(b). It was not contingent on a delegation or grant of authority from the legislature to set rates for other utilities by statute under § 156(c), unlike
 
 VEPCO 1955
 
 , which involved an electric company. The contrast between the two sets of cases is stark: where the Commission acted under § 156(b), it was "
 
 the
 
 legislative branch,"
 
 Norfolk & Western
 
 ,
 
 162 Va. at 322
 
 ,
 
 174 S.E. at
 
 88 ; where it acted under § 156(c), it acted under authority delegated by the General Assembly,
 
 VEPCO 1955
 
 ,
 
 196 Va. at 1109
 
 ,
 
 87 S.E.2d at 144
 
 .
 

 This historical context is not mere digression. The Commission on Constitutional Revision ("the CCR") affirmatively acted in 1969 to draft a constitution that elevated the Commission's authority over electric rates from a power merely delegated by the General Assembly to one with a direct constitutional foundation (like the Commission's authority over telephone and railway rates under the Constitution of 1902). It noted that the Commission lacked direct constitutional authority to set the rates of "companies furnishing gas and electricity, two of the most vital services provided to citizens of Virginia." Report of the Commission on Constitutional Revision 285 (1969). It proposed that the Commission "be given exclusive and paramount jurisdiction
 to regulate the rates, charges, and services of" such companies, just as it had existing authority over railroad and telephone companies.
 

 Id.
 

 Article IX, § 2 unquestionably places electric rates on equal footing with railroad and telephone rates. Consequently, whatever rate-making power the Commission has derives directly from the people, who adopted the Constitution of 1971, and cannot be only "delegated by the General Assembly." Therein lies the error in relying on a case that predates the Constitution of 1971 without examining its foundation.
 

 The majority notes that the General Assembly altered the CCR's draft by adding the "subject to" clause to Article IX, § 2. Relying on
 
 VEPCO 1974
 
 , it holds that this clause subordinates the Commission's rate-making authority to the General Assembly. But reflect for a moment on the implication of that holding. It means that rather than
 
 elevating
 
 the Commission's authority over electric rates to a direct constitutional foundation equal to that it already
 had over railroad and telephone rates under § 156(b) of the Constitution of 1902, the Constitution of 1971 instead
 
 diminished
 
 the Commission's authority over railroad and telephone rates to a mere statutory foundation like that it had over electric rates under § 156(c) of the Constitution of 1902. In other words, the majority's holding turns Article IX, § 2 upside-down, allowing the Commission to set railroad and telephone rates only with the legislature's indulgence, in effect eliminating the Commission's independence as the "additional" branch of government recognized in
 
 C&P
 
 and
 
 Norfolk & Western.
 

 Surely, if that seismic result had truly been the intention of the General Assembly when it appended the "subject to" clause to the CCR's draft of Article IX, § 2, there would be
 
 some
 
 mention of it in the record of its proceedings and debates. Yet the only mention of the clause or reason for adding it to the draft was made by Senator Edward L. Breeden, Jr., of Norfolk, chairman of the Committee on Insurance and Banking that proposed the amendment. He said that the intention was "to give legislative control over the
 
 general aspects
 
 of rate-making." Proceedings and Debates for the Senate of Virginia Pertaining to the Amendment of the Constitution 269 (Extra Session 1969, Regular Session 1970) (emphasis added). This slender reed will not bear the weight.
 
 [7]
 
 Nothing-not the language in the CCR's report, the language on the floor, or the language in Article IX, § 2 as adopted by the people-supports the dramatic result to which the majority's holding inexorably leads: that the General Assembly intended to
 
 weaken
 
 the Commission's longstanding, pre-existing power over railroad and telephone rates rather than
 
 strengthen
 
 its power over electric rates.
 

 I agree with the majority that the Commission has no authority to act simply because it is mentioned in the Constitution. To the contrary, as the Court stated in
 
 Elizabeth River Crossings OpCo, LLC v. Meeks
 
 ,
 
 286 Va. 286
 
 , 307,
 
 749 S.E.2d 176
 
 , 186 (2013) (internal quotation marks omitted), "its jurisdiction must be found either in constitutional grants or in statutes which do not contravene that document." But Article IX, § 2 does more than merely mention
 or create the Commission; it vests the Commission with power to set rates. The General Assembly need do nothing for the Commission to exercise this power, granted by the people. Consequently, it is not "delegated by the General Assembly."
 

 C. IF THE GENERAL ASSEMBLY CAN SUSPEND THE COMMISSION'S RATE-MAKING POWERS FOR A PERIOD OF YEARS, IT CAN SUSPEND THEM FOREVER
 

 If it is true, as the majority holds, that the Commission's rate-making authority is "subordinate to the power of the General Assembly,"
 
 supra
 
 at ---- (quoting
 
 VEPCO 1974
 
 ,
 
 214 Va. at 465
 
 ,
 
 201 S.E.2d at
 
 777 ), then the General Assembly has the power to permanently divest the Commission of that power at will. That sobering outcome thwarts the
 purpose behind creating the Commission in the first place.
 

 As the Court acknowledged in 1920, before the Constitution of 1902 created the Commission "the State, through the legislature, certainly had plenary power over the rates of all public service corporations, but the power had never been exercised. The avowed purpose of the convention, known to all, was to exercise the dormant power of the State for the control of such corporations. It provided for the organization of the commission, and made it the governmental department of the State for the exercise of such powers."
 
 City of Richmond v. Chesapeake & Potomac Telephone Co.
 
 ,
 
 127 Va. 612
 
 , 622,
 
 105 S.E. 127
 
 , 130 (1920).
 

 The appellants raise the specter of the General Assembly choosing to set rates itself. At oral argument, the Commonwealth repeatedly avoided the issue of whether the asserted "subordination" of the Commission to the General Assembly allowed the legislature to do so. It reiterated that its position was solely that Code § 56-585.1:1 merely froze the existing rates set by the Commission, in effect suspending the Commission's rate-making power. But if Article IX, § 2 confers on the General Assembly the power to suspend the Commission's authority, there is no limit to the duration for which such a suspension may last. Thus, this interpretation restores the precise evil that led the people to create the Commission in 1902; they did so to ensure that
 
 someone
 
 was exercising the power to set the rates of public service corporations. The conclusion that the General Assembly has the power to
 suspend the Commission's authority indefinitely, which follows inexorably from the majority's opinion, would thwart that will.
 

 The Commonwealth responded at oral argument that if some limiting principle were required to prevent the General Assembly from suspending the Commission's authority for too long, democracy was the limiting principle-i.e., that the voters would reprimand the legislature. The majority adopts this aphorism as its answer, too. Together, they seem to envision that after some period of sufficient duration, a majority of voters in a majority of the districts will revolt, uniting under the banner that the Commission's authority must be restored, and secure a bicameral legislative majority to compel that outcome. Despite having been previously elected to legislative office, I cannot begin to speculate how many years would have to pass before the esoteric issue of the Commission's constitutional authority to set rates rose to predominate over other public policy issues.
 

 But more to the point, the people already have endured a period of legislative inaction in the field of rate-making. They spoke clearly against it when they created the Commission in 1902. They granted the Commission rate-making authority over railroads and telephone companies then, and expanded that power to include electric companies in 1971. Nothing in the text or history of Article IX, § 2 counsels otherwise.
 

 D. CONCLUSION
 

 For these reasons, I reject the conclusion that the Commission's rate-making authority is subordinate to the General Assembly. The clear and unambiguous language of Article IX, § 2 allows the legislature to control the general aspects of rate-making by establishing, by statute, standards and prerequisites for the Commission's exercise of its constitutional power. Article IX, § 2 does not empower the General Assembly to suspend the Commission's rate-making authority, whether for one year or forever. I therefore respectfully dissent from the majority's holding to the contrary.
 

 VEPCO argued that the words "except as may be otherwise authorized by the Constitution or by general law, the facilities of railroad, telephone, gas, and electric companies" expressly permitted the General Assembly to supersede the Commission's authority to regulate facilities by statute, so the "subject to" clause at the beginning of the sentence could not have the same effect on the Commission's authority to regulate "rates, charges, and services."
 

 The majority's conclusion that "[a] law suspending the Commission's" rate-making process "fits comfortably" within the definition of "requirement,"
 
 supra
 
 at 765, is unclear to me. Even accepting the majority's alternative definition of "requirement," Code § 56-585.1:1 does not impose some condition that the Commission must fulfill before it sets rates. There is no requirement or prerequisite that the Commission may satisfy in order to proceed to setting rates. To the contrary, the statute simply prohibits the Commission from setting rates, regardless of what it does first.
 

 This interpretation shows that VEPCO was incorrect to argue that the "subject to" clause merely empowered the General Assembly to establish rules of practice and procedure. However, it also illustrates that the Court went too far in rejecting VEPCO's mistaken interpretation. There is a middle ground between VEPCO's interpretation of the clause and interpreting it to mean that the Commission's rate-making authority is wholly subordinate to the General Assembly, as the Court ruled.
 

 This provision does not create "criteria," but it does impose a "requirement," further illustrating the difference between the two.
 

 Potomac Edison II
 
 also cites
 
 Hopewell Cogeneration Ltd. Partnership v. State Corporation Commission
 
 ,
 
 249 Va. 107
 
 , 115,
 
 453 S.E.2d 277
 
 , 281-82 (1995), but this case states only that rate-making is a legislative function, not that the General Assembly delegated power to the Commission.
 

 Central Telephone Co.
 
 also cites
 
 Howell v. Chesapeake & Potomac Telephone Co.
 
 ,
 
 215 Va. 549
 
 , 557,
 
 211 S.E.2d 265
 
 , 270 (1975),
 
 Commonwealth v. Portsmouth Gas Co.
 
 ,
 
 213 Va. 239
 
 , 241,
 
 191 S.E.2d 220
 
 , 222 (1972), and
 
 City of Lynchburg v. Chesapeake & Potomac Telephone Co.
 
 ,
 
 200 Va. 706
 
 , 712,
 
 107 S.E.2d 462
 
 , 467 (1959), but these cases, like
 
 Hopewell Cogeneration
 
 , state only that rate-making is a legislative function, not that the General Assembly delegated power to the Commission.
 

 To the contrary, the "general aspects of rate-making" are consistent with the meanings of "criteria" and "requirements" in context that I describe above. They include the General Assembly's power to establish standards and prerequisites. They do not include empowering the General Assembly to suspend the Commission's authority to set rates altogether.